[No. 1763.]

LEWIS WILSON *v.* THE STATE.

1. RAPE — EVIDENCE.— While it is competent in prosecutions for rape for the accused to impeach the reputation of the prosecutrix for chastity, not to justify or excuse the offense, but to raise a presumption that she yielded her consent and was not in fact forced, the rule is limited to general reputation, and to acts of illicit intercourse with the accused alone, and is not extended to specific acts with other persons than the accused.

2. SAME.— That the prosecutrix had, previous to the alleged rape, given birth to an illegitimate child, was competent evidence to prove general reputation for chastity, and it was error, in the first instance, to exclude such evidence. But, inasmuch as at a subsequent stage of the trial the same evidence was elicited from the same witness, the error, so far as it was calculated to prejudice the accused, was cured.

3. SAME — CASE STATED.— Whilst the witness called by defendant to testify as to the illegitimate child of the prosecutrix was on the stand and after the court, on the State's motion, refused to admit evidence on that point, the defendant asked the witness what had been the reputation of the prosecutrix for chastity before and since the birth of the bastard child, to which the witness answered that her general reputation for chastity had always been good so far as he knew. Subsequently, when the prosecution introduced evidence to support the reputation for chastity of the prosecutrix, the defendant objected upon the ground that he had not impeached the character of the prosecutrix for chastity. In overruling this objection, the judge, in the hearing of the jury, remarked that if the defendant had not so impeached her character, he had attempted to do so and failed. *Held,* that this remark was not such a violation of the rule prescribed by article 729 of the Code of Criminal Procedure, to the effect that, in ruling upon the admissibility of evidence, the judge shall not comment upon its weight, etc., as to warrant a reversal of the conviction. See the opinion *in extenso* on the question. Note also the suggestion of this court to trial judges in passing upon objections interposed to the introduction of evidence.

4. SAME — PRACTICE.— An effort on the part of the defendant, though unsuccessful, to impeach the character of a State's witness, raises the issue of character sufficiently to warrant the State in producing evidence to support the character of its witness. That the State is entitled to introduce evidence to fortify the character of its witness only after the defendant's attempt to impeach it is successful is a doctrine which cannot be maintained.

5. ARRAIGNMENT — PLEA. — If the record, in a capital case, on appeal shows that the defendant pleaded "not guilty," but is silent respecting the arraignment of the defendant, this court, presuming that an arraignment was waived, will not reverse the judgment of conviction for want of an arraignment; but if the record shows neither an arraignment nor a plea the judgment will be set aside.

6. RAPE — CHARGE OF THE COURT — REASONABLE DOUBT. — Upon the subject of penetration, the court in a rape case charged the jury in effect that, in order to authorize a conviction, they must find from the evidence that the defendant did "penetrate the person of the said Dubbs, and did have carnal knowledge of, and connection with her, without her consent;" — the next clause applying the reasonable doubt to the whole case. *Held*, sufficient in the absence of requested charges presenting a fuller exposition of the law.

7. NEW TRIAL — NEWLY-DISCOVERED EVIDENCE. — See the opinion *in extenso* for newly-discovered evidence set up in a motion for new trial, *held*, in view of the evidence adduced, not to be of such character as to have authorized the award of a new trial.

8. SAME — FACT CASE. — See the statement of the case for evidence *held* sufficient to support a capital conviction for rape.

APPEAL from the District Court of Grayson. Tried below before the Hon. R. Maltbie.

The conviction in this case, upon which the appellant was awarded the death pealty, was for the rape of one Catherine Dubbs, in Grayson county, Texas, on the 26th day of October, 1884.

Mrs. Catherine Dubbs was the first witness for the State. She testified that she was a resident of the city of Denison, Grayson county, Texas. She had known the defendant, Lewis Wilson, since June or July, 1884. He lived about one hundred and fifty yards distant from the witness on the opposite side of the new public school building in the fourth ward in the southeastern portion of the city of Denison. He passed the witness's house on his way to and from the business part of town. The witness was a widow with one child. She was married to Alfred Dubbs about six years prior to this trial. Her husband had been dead about two years. Witness lived with her mother, Mrs. Martha Bruntz, and her sister, Miss Ida Ingram, in her mother's house. While in that house, alone, having gone to bed, she was assaulted by the defendant on the night of October 26, 1884. Witness had sat up with her sick sister, Mrs. Dunn, through the three preceding nights, and was to resume the watch at Mrs. Dunn's sick bed at 12 o'clock that night, relieving her mother and her sister Ida. Her brother-in-law, W. H. Dunn, was to call the witness at 12 o'clock. Miss Ida Ingram, the witness's sister, left the house about dark, after the witness had gone to bed. The house occupied by the witness stood about a hundred or perhaps a

hundred and fifty yards distant from Dunn's house. The witness occupied the northeast corner room of the house, from which an open door led into the south room, in which, on the night of the assault, there was a fire burning. The witness was partially aroused about the middle of the night by a noise indicating the presence of some one in the house. The witness, who was much exhausted by recent loss of sleep, and a recent attack of fever, and impressed with the belief that the noise was made by the return of her mother, did not open her eyes, nor did she awaken entirely. Within a few seconds more the witness was again brought to a state of semi-consciousness by the noise of some one stumbling over a chair in the south room. She then distinctly heard the noise of some one moving about that room in sock-feet. Still thinking the person was her mother, moving carefully to avoid disturbing the witness, she dozed off again, but soon became conscious of the presence of some one in her room, and at her bedside.

Becoming thoroughly conscious of this fact, the witness opened her eyes and saw a black man, whom she recognized as the defendant, looking down upon her. Thoroughly frightened, the witness sprang up from the bed. This action seemed to frighten the defendant for a moment, but, controlling his fear, he caught the witness's right arm with his left hand, and with his right seized her throat in front. He then, with furious oaths and threats to cut the witness's throat if she made outcry, threw her back on the bed. The witness struggled with all the force she could command to prevent the now evident purpose he had in view. The defendant then seized the witness by the lower limbs, just above the knees, and threw her lengthwise on the bed. Witness struggled with her utmost strength until she was exhausted and overcome, and then was ravished by the defendant. The defendant accomplished his purpose completely, and had carnal knowledge of the witness, fully penetrating her person with his male member, all of which was done by force, without the consent of the witness, and despite her utmost struggles. This all occurred in Denison, Grayson county, Texas, on the night of October, 26, 1884.

After perpetrating this outrage upon the witness the defendant said to her: "Now, d—n your white soul, do you know me?" Witness, in mortal terror, replied that she did not, and the defendant, uttering the most horrible oaths, replied: "If I thought you knew me, I would cut your throat from ear to ear." He then passed into the south room, from which he presently returned and told the witness good-bye. The witness making no reply, the de-

fendant cursed and denounced her in a fearful manner, and threatening her with a terrible death, compelled her to bid him good-bye. He threatened to murder the witness if she ever told that she had been outraged, or if she moved from her bed that night. He then left witness, passing into the south room, and witness saw no more of him until about one hour later, when she saw him in the custody of the officers.

The defendant had scarcely time to get out of the house before the witness heard some one, wearing shoes, moving about the south room, whereat she became much frightened under the impression that some other man, in complicity with the defendant, had come to repeat the outrage. However, she soon discovered that the new comer was her brother-in-law, William H. Dunn, who had come to escort her to his house to resume her watch over her sick sister. She called Dunn into her room, told him of the outrage, and who had perpetrated it. Dunn secured the assistance of some of the neighbors, removed the witness to his house, and despatched a messenger for the officers. The defendant is a strong, robust negro man, and in his assault upon the witness was exceedingly rough and severe, bruising the defendant's arms and lower limbs. He wore wet, muddy socks, and muddied the bed clothes considerably. The defendant often brought vegetables to the house of witness, and sold them to witness's mother. Witness knew him well by sight, and by his voice. She recognized the person who outraged her to be the defendant, Lewis Wilson, by his voice, his size, and general appearance. It was not light enough in the room to distinguish his features.

Cross-examined, the witness testified that she lived in her mother's house, with her mother, her sister and her little daughter. Witness's husband had been dead about two and a half years. During a part of the first year of her widowhood the witness lived in her own house with her child and her youngest sister. Witness did not see the defendant on the night of the outrage until she saw him standing by her bedside, bending over her. She knew him instantly, and at the very first denounced him to her brother-in-law, as the man who raped her. She denounced him as the man, before his arrest, to her mother and sister. The outrage was perpetrated on a moonless, and consequently rather a dark night. Rain had fallen on the previous day and the ground was muddy. There was a fire burning in the south room, and the door leading from that into the witness's room was open. The witness had never made a different statement than her present one, concerning this affair, to any one.

Witness fully identified the defendant as her ravisher when she con-fronted him in the custody of the officers, on the night of his arrest, and then and there declared to the officers that the defendant, and none other, was the man who raped her. In raping the witness, the defendant hurt her severely and bruised her arms and legs. Witness did not, while the defendant was forcing her, cry out, as she knew it was useless, and besides, she was afraid to do so, believing that defendant would kill her. Neither the witness's clothing nor the bed clothing was torn in the scuffle with the negro. Witness was so much overcome and exhausted with what she had gone through, that she did not recognize the voice of her brother-in-law when he first came to her house, after and on the night of the rape.

W. H. Dunn, the brother-in-law of Mrs. Dubbs, the injured female, testified for the State that, on the night of October 26, 1884, about 12 o'clock, he called at the house where Mrs. Dubbs lived with her mother, sister and child, to get Mrs. Dubbs to go to his house and sit up with his sick wife. To the witness's first call, Mrs. Dubbs made no response. He called again, and in reply she called from her room: " O Billie! come here." Witness went to her bed, when she twined her arms about his neck, told him what had happened, and that the defendant was the perpetrator of the outrage. Mrs. Dubbs's condition at that time was very distressing, her nerves being completely unstrung. Witness had her removed to his house, and sent for the officers and caused the arrest of the defendant.

On cross-examination the witness stated that the night on which the outrage was committed was so dark that a person could not recognize another five or six feet distant, unless well acquainted with such person. Witness heard no noise or outcry before he reached Mrs. Dubbs's house. He called to Mrs. Dubbs before he got to the house, in order to arouse without frightening her. He noticed no displacement or disarrangement of the furniture in the house, or other unusual disposition of household things.

T. M. Wright testified, for the State, that he was a policeman, and as such was on duty in the city of Denison on the night of October 26, 1884. A few minutes after 11 o'clock on that night, he saw the defendant go out of Cutler's saloon in Denison, and walk off in the direction of the house occupied by Mrs. Dubbs and her mother, which was also in the direction of his own, the defendant's, house. A little after 12 o'clock on that same night the witness was summoned to arrest the defendant for the rape of Mrs. Catherine Dubbs. Witness went to defendant's house in company with Mr. Mixon and Mr. Breaker, and found him in bed, and arrested him. He had on, at

the time of his arrest, a pair of worn, muddy socks. His feet were muddy at the different rents in his socks. The arrest was made on a very muddy night. Witness told the defendant why he arrested him. He said nothing whatever in reply that could be construed into a denial of the charge. Witness took the defendant before Mrs. Dubbs, and she declared that he was the negro who raped her.

Cross-examined, the witness stated that before he confronted the defendant with Mrs. Dubbs, he placed defendant in a room separate from but in the hearing of Mrs. Dubbs, and had him to talk. Mrs. Dubbs immediately pronounced his voice to be the voice of the man who outraged her. Mrs. Dubbs had no knowledge that the witness intended to or did place the defendant in that room and required him to speak. It was a device to test her recognition of the voice, concocted without her knowledge or concurrence. She affirmed, on hearing the voice, without seeing the defendant, that it was the voice, in a lower key, of Lewis Wilson, the man who had outraged her. The defendant was then taken into her presence, and by her was positively declared to be her ravisher. The defendant's socks were similar in appearance to any other old dirty socks.

Ida Ingram, Mrs. Dubbs's sister, testified for the State that she saw the bruises on the arms and lower limbs of Mrs. Dubbs. Finger marks were distinct on the arms, but the bruises on the limbs were mere blotches. Witness noticed a considerable amount of mud on the bed clothing. She got to the scene of the outrage a very short time after Mr. Dunn did. Mrs. Dubbs told the witness, and her mother as well, all about the outrage, and declared to both of them that the defendant was the man who outraged her. This was before the defendant was brought to the house under arrest. Mrs. Dubbs was much prostrated and in a very precarious mental and physical condition, when the witness arrived at the house.

Cross-examined, the witness stated that the night on which this affair occurred was quite dark. It was dark in Mrs. Dubbs's room. When the witness left Mrs. Dubbs's house that evening about dark, a fire was burning in the south room. She saw no lamp in Mrs. Dubbs's room. The furniture in that room was not disarranged, so far as the witness saw.

John Breaker testified, for the State, that he was with the officers who arrested the defendant. When arrested the defendant was in bed at his house, about eighty yards distant from the house occupied by Mrs. Dubbs. He had on a pair of very muddy socks. His shoes were perfectly sound and nearly new.

Deputy sheriff and jailer M. O'Callaghan testified, for the State,

that when defendant was placed in jail on the morning after the alleged rape, October 27, 1884, he had on a pair of worn, muddy socks. His shoes were sound. At this point the State closed.

W. H. Dunn was the first witness introduced by the defendant. He testified that when he first saw Mrs. Dubbs on the night of the outrage, just after it had been perpetrated, she was in a very collapsed condition, her nervous system being completely unstrung. She told him at once what had happened and who the perpetrator of the outrage was. Witness did not attend the officers when they went to arrest the defendant, because his wife was very sick and he was in momentary expectation of her death. He did not know that Mrs. Dubbs was unwell, and was suffering from the flow of her monthly courses at the time of the outrage.

Mrs. Dubbs was the next witness introduced by the defense. She testified that she was not in her monthly period on the night of the assault, but had passed that period two weeks before. But a short time elapsed between the departure of the negro and the arrival of Mr. Dunn. She did not think at the time that the negro had had time enough to get away, and believed then that he was still secreted in the south room. She did not recognize her brother-in-law Dunn when he first spoke.

Constable A. W. Mixon testified, for the defense, that he went to the defendant's house about 12 o'clock on the night of October 26, 1884, and found him in bed. Witness did not know whether or not he was asleep. There were no lights in the house. Witness and his party arrested the defendant and took him to Mrs. Bruntz's house, where Mrs. Dubbs was at that time. Mrs. Dubbs fully identified the defendant as the man who outraged her. Witness went back to Mrs. Dubbs on the next morning and Mrs. Dubbs again declared that the defendant was her ravisher. Mrs. Dubbs was comparatively calm on this morning, whereas on the night before she was very much excited. Her two statements, in denouncing the defendant as her ravisher, were substantially the same.

Mike Hanno was the next witness for the defense. He testified that he knew Mrs. Catherine Dubbs before her marriage to Dubbs, when her name was Catherine Ingram. The man Dubbs whom she married was a saloon keeper. Upon the promise of the defendant's counsel to qualify the testimony by subsequent proof that Mrs. Dubbs's reputation for chastity was bad, this witness was permitted to testify that, in 1877, when Mrs. Dubbs was yet Miss Ingram, he, the witness, seduced her, and she, in consequence, gave birth to a bastard child. The defendant then asked the witness what was the

general reputation of Mrs. Dubbs for chastity, before, at and after the birth of her bastard child, and he replied that it was good. Upon the motion of the prosecuting attorney, the court withdrew and ruled out so much of the testimony of the witness as related to the seduction of Mrs. Dubbs, and the birth of the bastard child. The defense closed.

Resuming, the State re-introduced the witness Mike Hanno, who testified that when he seduced Mrs. Catherine Dubbs in 1877, at which time she was some sixteen or seventeen years old, he did so under a promise of marriage. For two years prior to the birth of Mrs. Dubbs's bastard child, he, witness, had carnal intercourse with her whenever and as often as he felt inclined. The witness was indicted for the seduction of Mrs. Dubbs, then Catherine Ingram, and offered, in good faith, to marry her in order to defeat the prosecution, which offer she declined, and the prosecution against the witness was dismissed. She afterwards married a saloon keeper named Dubbs, and lived with him as his wife until his death. Her reputation for chastity before and after her seduction was good.

Three witnesses, who had known Mrs. Dubbs from four to seven years, testified that her reputation for chastity had always been good. They were corroborated by five others who lived in the same neighborhood Mrs. Dubbs lived in. These last five, on cross-examination, testified that they knew one Henry Crutcher who boarded and slept at Mrs. Dubbs's house about a year before this trial. No one save her little daughter lived with Mrs. Dubbs at that time. Crutcher was a single man in the employ of Mr. Boss. Crutcher had since left the country, and his present whereabouts was unknown to the witnesses.

Esther Sims testified, for the defense, that she lived near Mrs. Dubbs when young Mr. Crutcher boarded and roomed at Mrs. Dubbs's house. Mrs. Dubbs's reputation for chastity was then very bad.

The newly-discovered evidence, upon which in part a new trial was asked, was set forth in the affidavit of one William Johnson. In substance the affidavit set up that affiant and defendant worked together on a tie train; that affiant often heard the defendant speak of going to see his "white girl;" that one night defendant left Fox's saloon in the city of Denison between 12 and 1 o'clock, saying that he was going to see his "white girl;" that affiant followed him secretly, and saw him stop and knock at the door of Mrs. Catherine Dubbs, the prosecutrix; that in a few minutes he saw Mrs. Dubbs open the door and admit the defendant, close and lock the door;

that he then approached the house and saw the prosecutrix and the defendant go to bed together, and further that he watched and saw what afterwards transpired between them in bed, as well as he could outside of the house.

The defendant further proposed, if granted a new trial, and awarded compulsory process for unwilling and intimidated witnesses, to prove Mrs. Dubbs's general reputation for chastity to be very bad, that she had lived in open adultery with Henry Crutcher, after her widowhood, and that to one witness, at least, she declared, after her alleged rape, that she had no idea of the identity of her ravisher.

In opposition to the motion for new trial and the supporting affidavit of Johnson, the State filed a number of affidavits showing that no man named William Johnson could be found to have lived in the city of Denison for nine years previous to this trial. One affidavit affirmed that one of the defendant's counsel described the said Johnson as a white man. The affidavit of the officer who qualified the said Johnson to his said affidavit, described the purported Johnson as a black negro. The affidavit of Mrs. Dubbs denied that she had ever declared to any one, that she did not know who ravished her.

*Charles Roberts, A. C. Turner* and *G. W. Pasco,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. Appellant was convicted of rape upon one Catherine Dubbs, and his punishment was assessed at death.

On the trial appellant proposed to prove that several years before the alleged rape the prosecutrix had given birth to an illegitimate child. This evidence was proposed for the purpose of impeaching the chastity of the prosecutrix. On objection by the prosecuting officer the evidence was disallowed, and defendant saved his bill of exceptions.

In prosecutions for rape it is unquestionably competent for the accused to impeach the character of the prosecutrix for chastity,— not, indeed, to justify or excuse the offense, but to raise a presumption that she yielded her consent and was not in fact forced. But the rule seems to be limited to general reputation for chastity and to acts of illicit intercourse with the accused alone, whilst specific acts with other parties than the accused are not competent and admissible as evidence. (*Pefferling* v. *The State,* 40 Texas, 492; *Dorsey* v. *The State,* 1 Texas Ct. App., 33; *Rogers* v. *The State,* 1 Texas

Ct. App., 187; *Jenkins* v. *The State*, 1 Texas Ct. App., 346; *Commonwealth* v. *Harris*, 131 Mass., 336; *State* v. *Daniel*, 87 N. C., 507.)

A step beyond this has been taken by the supreme court of Tennessee in *Benstine* v. *The State*, 2 Lea, 169. In that case the rule announced by Mr. Justice Cowan in *The People* v. *Abbott*, 19 Wend., 194, is adopted, to the effect " that previous intercourse with other persons may be shown as bearing directly upon one of the principal questions at issue, that is, whether the intercourse was by force or with consent of the injured female; and this for the reason that no impartial mind can resist the conclusion that a female who had been in the recent habit of illicit intercourse with others will not be so likely to resist as one who is spotless and pure." (See same case reported in 3 Amer. Crim. Repts. (Hawley), 388.)

However reasonable this latter rule may appear, with us the doctrine is too well established and understood otherwise, as stated above, to be now extended or interfered with. (*Pefferling* v. *The State*, 40 Texas, 492.) That rule makes general reputation and illicit acts with the accused alone admissible as evidence of want of chastity. That an unmarried woman has given birth to an illegitimate child, judging from the evidence which was subsequently adduced in this case, will not always affect her general reputation for chastity. Still such evidence is admissible on proof of "general reputation" for chastity. It should not have been excluded in this case when proposed by defendant. Subsequently, however, it appears that all the facts and circumstances connected with the birth of this illegitimate child were fully drawn out by the prosecution through the same witness by whom they were proposed to be proven by defendant. Having subsequently been fully developed, defendant could not possibly have been injured by the previous ruling excluding the evidence when offered by himself. And the error of the court in the first instance was entirely cured.

It seems that whilst this witness was upon the stand at the call of defendant, to testify as to the illegitimate child, and after the court at the motion of the prosecution had excluded his testimony, "defendant then asked the witness what the general reputation of the prosecutrix before and since she had given birth to the bastard child had been for chastity. The witness answered that her general character for chastity had always been good so far as he knew." This quotation from the bill of exceptions is made for the purpose of showing that defendant, though he was denied the right of evidence as to the illegitimate child, was not denied the right, but, on the contrary, had directly and positively put the general character

of the prosecutrix for chastity in issue, by asking this question. Subsequently when the prosecution introduced a number of witnesses to prove her general good reputation for chastity, defendant objected,— the ground of objection stated being "that he had not impeached the character of the prosecutrix for chastity." This objection, as we have seen, is contradicted by the record.

In overruling this objection the judge remarked, and the remark was made in the presence of the jury, that "if he (defendant) had not done so (that is, impeached her character) he had attempted to do so and failed." Defendant saved a bill of exceptions to this remark of the judge as a comment upon the weight of evidence and one calculated injuriously to affect the rights of defendant before the jury.

Bearing upon this subject it is provided by statute that "in ruling upon the admissibility of evidence the judge shall not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether or not it be admissible. Nor shall he at any stage of the proceedings previous to the return of a verdict make any remark calculated to convey to the jury his opinion of the case." (Code Crim. Proc., art. 729.)

In this instance has the judge violated the spirit of this inhibition? Has he commented upon the weight of the evidence and its bearing in the case? Let us see. The State proposed to prove general reputation for good character. Defendant's counsel says: "I object because I have not impeached the character of the prosecutrix for chastity," and the court replied, "if you have not done so you have attempted to do so and failed." If defendant had not impeached her character, as he asserted, then it must be clear that the remark could not harm him, because it was not and could not be a comment upon evidence he had never offered. But, says the court, "if you have not done so you have attempted to do so and failed." We gather from this remark simply that the court stated as a reason for admitting the evidence that, whilst it might be true that defendant had not in fact impeached the witness, his attempt to do so and failure to do so had notwithstanding been sufficient to open up for investigation by the prosecution the question or issue of general reputation for chastity. In other words, that the issue having been attempted, it mattered not whether it was successfully or unsucessfully maintained,— that gave the other side the right to meet it and ventilate it fully. We do not understand the remark as a comment upon or disparagement of any evidence which defendant had introduced. If it could fairly and legitimately be so considered, then

we would not hesitate to say that it was not only irregular, but highly improper and illegal.  (1 Bish. Crim. Proc., § 981; 3 Graham & Waterman on New Trials, 731; *Barker* v. *The State,* 48 Ind., 163; *State* v. *Breeden,* 58 Mo., 507; *Fitzgerald* v. *The State,* 12 Ga., 213; *Stuckey* v. *The State,* 7 Texas Ct. App., 174; *Copeney* v. *The State,* 10 Texas Ct. App., 473.)

" The jury in all cases are the exclusive judges of the facts proved and the weight to be given to the testimony." (Code Crim. Proc., art. 728.)  " The court, in the trial of a case before it, is presumed to be, and should be, an impartial arbiter as to the legal rights of the parties, and if competent evidence is submitted to the jury it is their exclusive province to consider that evidence without any expression of opinion by the court as to whether it is of much or of but little value." (*Warmack* v. *The Mayor, etc.,* 53 Ga., 162.)

In view of our statute, it would be well if judges, in ruling upon the admissibility of evidence, would severely abstain from anything beyond a simple announcement of the ruling.  So far as we have been able to see in this particular instance, the irregularity does not amount to reversible error, if error it be.

As to the other bill of exception, with regard to the right of the State to introduce evidence of good character for chastity of the prosecutrix, the objection raised being that such evidence is inadmissible until the defendant has first impeached her character, such objection is not maintainable where an effort on the part of defendant has been made for this purpose.  An attempt by defendant to impeach raises the issue sufficiently to warrant and justify the prosecution in the introduction of evidence upon the subject.

But again, it is insisted that fundamental error is apparent on the record in that it fails to show affirmatively that defendant, who was about being tried for a capital felony, was arraigned prior to being put upon his trial.  (Code Crim. Proc., art. 508.)  " An arraignment takes place for the purpose of reading to the defendant the indictment against him, and hearing his plea thereto." (Code Crim. Proc., art. 509.)  " The principal office of the arraignment is to fix the personal identity of the accused." (*Hendrick* v. *The State,* 6 Texas, 341.)  It has never been held, however, that the arraignment *per se,* as a prescribed method of procedure in capital cases, was a *sine qua non* to the validity of the conviction.  A contrary *dictum* appears in *Smith* v. *The State,* 1 Texas Ct. App., 408, but the authorities cited in support of the *dictum* do not warrant it, and in that case the record disclosed that the defendant had been arraigned, and also that he had pleaded.  The correct rule is that, where there is

neither arraignment nor plea, the case must be reversed, because the verdict is a nullity and no valid judgment could be rendered on it. (*Early* v. *The State*, 1 Texas Ct. App., 248; *Holden* v. *The State*, 1 Texas Ct. App., 225.) And if the record is silent as to both, the conviction will be set aside. (*Lister* v. *The State*, 1 Texas Ct. App., 739; *Pringle* v. *The State*, 2 Texas Ct. App., 300; *Avara* v. *The State*, 2 Texas Ct. App., 419.)

In the case under consideration the record is silent as to the arraignment, but affirmatively shows that the defendant pleaded " not guilty." In such a case the rule is as announced in *Plasters* v. *The State*, 1 Texas Ct. App., 673, to the effect that "if the record shows that the accused pleaded not guilty, but is silent respecting the arraignment, this court, presuming that an arraignment was waived, will not reverse the judgment of conviction for want of an arraignment; but if the record shows neither an arraignment nor a plea, the judgment would be set aside."

Objections are urged to the sufficiency of the charge of the court, in that it omitted to instruct the jury as to the effect the want of chastity should have in considering of their findings, and that it omitted to instruct them upon the subject of penetration, and that the same must be established beyond a reasonable doubt. The charge is not, perhaps, as explicit as it might have been. Still, considered in the light of the evidence, we canot say that it lacks in any of the essential qualities demanded by the law and the evidence. In the sixth paragraph the jury were expressly required to find that defendant had " penetrated the person of the said Dubbs, and had carnal knowledge and connection with her, without her consent," before and as a prerequisite to a finding that defendant was guilty of rape as charged; and the reasonable doubt charged in the next succeeding paragraph applied to the whole case. In the absence of requested instructions presenting a fuller exposition of the law, we must hold that the charge upon this matter meets the requirement of the rule announced in *Davis* v. *The State*, 43 Texas, 189, cited by counsel in the brief. No exception was made to the charge, and we cannot see that any material error of omission or commission is contained in it, calculated injuriously to deprive defendant of any right, or to mislead or misdirect the jury in any matter essential to his rights.

As to the newly-discovered evidence claimed in the defendant's motion for a new trial, suffice it to say that no amount of evidence as to the prosecutrix's want of chastity should overcome proof of the fact that she was ravished by force, as shown by the violence or

marks of violence upon her neck and other portions of her person, and her condition, mental and physical, immediately after the occurrence, as testified to by the witnesses. Rape may be committed upon the most notorious prostitute, and if the physical facts and personal violence are proven, it were worse than idle to attempt to rebut them simply by proof of want of chastity. The affidavit of the newly-discovered witness Wm. Johnson is certainly made to appear in most questionable shape by the several counter-affidavits submitted in behalf of the prosecution. Even should he have been sworn to what he deposes in his affidavit, we do not believe from the evidence disclosed in this record that his statements would appear to any impartial mind even probably true, or that they would have had any appreciable effect upon the result of the trial.

Issue was taken by the State upon the causes set forth in the motion for new trial, as provided by article 781, Code Crim. Procedure. The style and mode of expression used by the county attorney in his affidavits tendering the issue are perhaps obnoxious to the criticism of counsel for the defendant, and as matter of taste some expressions used had as well perhaps been omitted in consideration of the gravity of the questions involved. Still, the procedure was one pending alone before the judge, and where no injury could likely result to defendant.

We have given this record our most serious consideration, aided by the able brief of counsel for appellant, and we are constrained to say we have found no material error for which the judgment should be reversed. We are of opinion appellant has had a fair and impartial trial, and that his guilt of rape, one of the most heinous of the crimes known to the law, has been fully established, and consequently we believe the judgment, notwithstanding it is fraught with such serious consequences to appellant, should in all things be affirmed.

*Affirmed.*

[Opinion delivered February 7, 1885.]